UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 15-CV-6240 (RER)

———————————

CYDNEY GILMORE,

Plaintiff,

VERSUS

ALLY FINANCIAL INC. AND ALLY BANK,

Defendants.

————————

April 24, 2017

————————

**RAMON E. REYES, JR., U.S.M.J.:**

Plaintiff Cydney Gilmore (hereinafter "Plaintiff" or "Gilmore") filed a putative class action against Defendants Ally Financial Inc., and Ally Bank (collectively "Ally" or "Defendants") pursuant to: the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691-1691(f); New York General Business Law ("GBL") Art 22-A, § 349; and New York common law. (Dkt No. 9, Complaint, ("Compl.")). Plaintiff alleges that Defendants, who are engaged in the business of purchasing retail finance contracts from car dealers, maintain a policy or practice of allowing these dealers to mark up the financing rate they offer consumers based on subjective criteria unrelated to creditworthiness. (Compl. ¶¶ 1, 6, 24, 35-37).

According to Plaintiff, Defendants' policy or practice has a disparate impact on African-American customers, which results in their paying more to finance vehicles with Defendants than similarly situated white borrowers. (*Id.* ¶ 17). To remedy this alleged disparate impact, Plaintiff seeks, *inter alia*, an order certifying the class pursuant to Fed. R. Civ. P. 23; actual, statutory, and punitive damages; pre-judgment and post-judgment interest; reasonable attorney's fees and costs; and injunctive relief. (*Id.* ¶¶ 3, 58).

Defendants have moved to dismiss the Complaint, primarily arguing that: 1) Plaintiff's claim is moot in light of the monetary relief that she was offered pursuant to two 2013 Consent Orders; 2) Plaintiff has no standing to bring this action because she has not pleaded a cognizable injury that is fairly traceable to Defendants' conduct; and 3) Plaintiff has failed to adequately plead a prima facie ECOA claim. (Dkt. No. 13, Memorandum of law in Support of

Defendants' Motion to Dismiss ("Def. Mem."), at 7-19).

As discussed more fully below, Defendants' motion to dismiss is GRANTED without prejudice as Plaintiff has not established Article III standing.

## BACKGROUND

In assessing the present motion to dismiss, the Court accepts the following well-plead facts as true. *Goldstein v. Pataki*, 516 F.3d 50, 53 (2d Cir. 2008). The parties have consented to my jurisdiction pursuant to 28 U.S.C. 636(c) (Dkt. Nos. 15–17).

### I. Procedural History

On September 18, 2015, Gilmore commenced this action by filing a Summons with Notice in New York State Supreme Court, Kings County. (Dkt No. 1, Exhibit A). On October 30, 2015, Defendants removed the case to this Court. (Dkt. No. 1). On November 30, 2015, Plaintiff filed a Complaint on behalf of herself and a putative class of similarly situated consumers. (*See* Compl.).

On January 15, 2016, Defendants filed a Notice of a Motion to Dismiss the Complaint accompanied with a Memorandum in Support of the Motion to Dismiss. (Dkt. No. 12, Notice of Motion to Dismiss, ("Notice Mem."); Dkt. No. 13, Defendants' Memorandum in Support of their Motion to Dismiss, ("Def. Mem.")). On January 21, 2016, I held a hearing on the Defendants' Motion to Dismiss and the underlying lawsuit. (*See* Dkt. No. 16, Transcript of Proceedings held on January 19, 2016). Following the hearing, Plaintiff filed a letter in opposition to Defendants' Motion to Dismiss. (Dkt. No. 18). On September 27, 2016, Plaintiff filed a Memorandum Opposing the Defendants' Motion to Dismiss, (Dkt. No. 21, ("Pl. Mem."), and Defendants' filed a second Memorandum in Support of their Motion to Dismiss. (Dkt. No. 22).

### II. The Parties and Transaction

Ally, formerly GMAC, Inc., is a Delaware financial services corporation, with a principal place of business in Michigan (Compl. ¶ 5). Ally finances auto loans to consumers throughout the United States. (*Id.*). As one of the largest banks and leading automobile lenders in the nation, Ally has funded millions of loans to automobile dealers nationwide. (*Id.* ¶ 6).

Ally regularly participates in the decision to extend credit to consumers by employing an underwriting process that helps establish consumers' loan interest rates. (*Id.* ¶ 22). First, Ally assigns one of six credit tiers to each loan applicant. (*Id.*). Next, based on the credit tier for which an applicant qualifies, Ally sets a "buy rate" for each loan. (*Id.* ¶ 23) The buy rate is a minimum interest rate for a loan that Ally will fund and is based on Ally's current cost of funds, adjustments that reflect the borrower's creditworthiness, and other objective criteria related to the borrower risk. (*Id.*). Ally then communicates the buy rates to automobile lenders who incorporate them into their "retail installment contracts." (*Id.*). Ally also indicates to dealers whether or not they will purchase these contracts. (*Id.* ¶ 7).

Through its agreements with dealers, Ally allows dealers to "mark up" a consumer's interest rate above Ally's established buy rate. (*Id.* ¶ 24). Plaintiff alleges that because Ally compensates dealers for part of the increased revenue that the dealers derive from their mark-up, Ally's arrangement indirectly creates financial

2

incentives for dealers to mark up borrowers' interest rates above the buy rates that Ally sets. (*Id.* ¶¶ 17, 24).

Plaintiff resides in Brooklyn, New York. (*Id.* ¶ 4). On or around July 22, 2013, Plaintiff went to Kristal Auto Mall in Brooklyn to "purchase and finance a vehicle for her personal use." (*Id.* ¶ 12). There, she discussed the purchase of her car with a salesman and finance manager. (*Id.*). Plaintiff then agreed to purchase and finance a used 2012 Cadillac. (*Id.*). Upon deciding to purchase the Cadillac, Plaintiff sat with the finance representative and was presented with a retail installment contract. (*Id.* ¶ 13). When the contract was presented, Plaintiff "voiced concern over the high rate of 9.54% being offered" to her. (*Id.*). The finance representative indicated that the rate presented was the rate for which Plaintiff "qualified" and added that she could "refinance the loan later to attempt to lower the rate." (*Id.*). Plaintiff then signed the contract and began to pay her loan. (*Id.*).

### III.    The Underlying Investigation

In September 2012, the Consumer Finance Protection Bureau ("CFPB") began examining Ally's indirect automobile lending program and its compliance with fair lending laws and regulations from April 1, 2011 to March 31, 2012. (*Id.* ¶ 18). The examination concluded that during the examined period, Ally's system caused African-Americans borrowers "to pay higher interest rates for their automobile loans than non-white borrowers because of their race or national origin and not based on their creditworthiness or other objective criteria related to borrower risk." (*Id.* ¶¶ 16-18). It further concluded that Ally had engaged in a pattern and practice of lending discrimination in violation of the ECOA § 1691(a)(1). (*Id.* ¶ 19). The CFPB then referred the case to the Department of Justice ("DOJ"). (*Id.*).

The DOJ similarly investigated Ally's indirect lending practices and reviewed loan-level data for more than 1.21 million automobile loans that Ally funded. (*Id.* ¶ 19). The investigation revealed that Ally's relationship with its dealers allowed dealers to mark up a consumer's interest rate above Ally's established buy rate, and it further concluded that Ally charged African-American borrowers more than white borrowers in interest rate mark-ups for reasons not based on creditworthiness or objective criteria related to borrower risk. (*Id.* ¶¶ 24–26). In December 2013, the DOJ sued Ally in the U.S. District Court for the Eastern District of Michigan for "discriminating against thousands of *inter alia* African-American consumer borrowers across the United States who obtained loans from Ally to finance automobiles." (*Id.* ¶ 15). That case settled, and Defendants entered into Consent Agreements with the DOJ and CFPB for injunctive, compensatory, and punitive damages owed to the government and consumers the government identified as affected by the alleged practices. (*See* Consent Order, *United States v. Ally Financial Inc. and Ally Bank*, No. 13-cv-15180, Dkt. No. 5 (E.D. Mich. 2013) (hereinafter "DOJ Consent Order"); Consent Order, *Ally Financial Inc.*, No. 2013-CFPB-0010, (hereinafter "CFPB Consent Order")).[1]

---

[1] The Court takes notice of these Consent Orders because "[w]here subject matter jurisdiction is contested, a district court may consider evidence outside the pleadings, such as affidavits and exhibits." *Fullwood v. Wolfgang's Steakhouse, Inc.*, No. 13 Civ. 7174 (KPF), 2017 WL 377931, at *2 (S.D.N.Y. Jan. 26, 2017) (citing *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *accord Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)).

In or about June 2015, Gilmore received a joint letter of notice from the DOJ and the CFPB informing her that she was identified as a member of a class of African American and/or Black consumers to receive a payment pursuant to an $80 million settlement between those governmental entities and Defendants. (*Id.* ¶ 14).

## IV. Plaintiff's Claims

Subsequent to receiving this letter, Plaintiff filed the instant action, in which Plaintiff alleges that Defendants have engaged in discrimination against consumer borrowers on the basis of race and national origin in violation of the ECOA § 1691(a)(1). (*Id.* ¶ 34). Plaintiff specifically alleges: that Ally's policies and practices constitute a pattern or practice of resistance to the full enjoyment of rights secured by the ECOA § 1691-1691(f); that Plaintiff and the Class are aggrieved applicants as defined under ECOA § 1691(e); and that Ally's policies were implemented intentionally. (*Id.* ¶¶ 34-38).

Plaintiff also asserts that Defendants' conduct was unfair, illegal, false, deceptive, and/or misleading, in violation of GBL § 349. (*Id.* ¶¶ 41-45). In addition, Plaintiff alleges a violation of the implied covenant of good faith and fair dealing, (*Id.* ¶¶ 49-54), and claims that Defendants were unjustly enriched in violation of New York common law. (*Id.* ¶¶ 55-58).

## **DISCUSSION**

### I. Standards for a Motion to Dismiss

Under Fed. R. Civ. P. 8(a)(2), a pleading must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009) (quoting Fed. R. Civ. P. 8). Dismissal is authorized under Fed. R. Civ. P. 12(b)(1) when the federal court lacks subject matter jurisdiction and under 12(b)(6) when the plaintiff fails to state a claim upon which relief can be granted. Fed R. Civ. P. 12(b)(1), 12(b)(6). When parties make motions under both rules, the court should "'consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined.'" *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir.1990) (quoting Wright and A. Miller, Federal Practice and Procedure § 1350, at 548 (1969)); *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82 (2d Cir. 2006).

Unlike the evaluation of a motion to dismiss under 12(b)(6), in which "[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff," under Rule 12(b)(1), "jurisdiction must be shown affirmatively, and that showing [may] not [be] made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citations and quotation marks omitted). Hence, whereas under Rule 12(b)(6), the movant bears the burden of proof, on a Rule 12(b)(1) motion, the party who invokes the Court's jurisdiction bears the burden to demonstrate that subject matter jurisdiction exists. *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) ("In resolving motion to dismiss under Rule 12(b)(1)… [w]here jurisdictional facts are placed in dispute, the party asserting subject matter jurisdiction 'has burden of proving by preponderance of evidence that it exists.'") (citations omitted); *see Sobel v. Prudenti*, 25 F. Supp. 3d 340, 352 (E.D.N.Y. 2014).

4

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Under Article III, § 2 of the Constitution, jurisdiction of federal courts is limited to "Cases" and "Controversies." U.S. Const. Art. III § 2. This "restricts the authority of the federal courts to resolving "actual and concrete disputes, the resolutions of which have direct consequences on the parties involved." *Genesis Healthcare Corp. v. Symczyk*, —U.S.—, 133 S. Ct. 1523, 1528, 185 L. Ed. 2d 636 (2013) (citations omitted). Without a case or controversy, a district court lacks the constitutional power to adjudicate, and the case must be dismissed. *Jennifer Matthew Nursing & Rehab Ctr. v. U.S. Dep't of Health and Human Servs.*, 607 F.3d 951, 955 (2d Cir. 2010).

## II. Article III Standing Requirements

The Supreme Court has called the doctrine of standing "perhaps the most important" of the case-or-controversy doctrines placing limits on federal judicial power as it derives directly from the Constitution. *Allen v. Wright*, 468 U.S. 737, 750, 104 S. Ct. 3315, 3324, 82 L. Ed. 2d 556 (1984). The doctrine requires a plaintiff to have a "personal stake," in the outcome of the action. *Summers v. Earth Island Institute*, 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L. Ed. 2d 1 (2009)). That is, a plaintiff must allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751.

The irreducible constitutional minimum for standing contains three elements. "[A] plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc., v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). The party seeking to invoke federal jurisdiction has the burden to establish each element. *See Spokeo, Inc. v. Robins*, —U.S.—, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016); *Ali v. N.Y. City Envtl. Control Bd.*, No. 14-CV-00312 (SLT)(CLP), 2015 WL 7281633 (E.D.N.Y. Nov. 16, 2015) (on a motion to dismiss, "[t]he plaintiff bears the burden of 'alleg[ing] facts that affirmatively and plausibly suggest that it has standing to sue.'").

Because standing is an essential component of a plaintiff's case, it "must be supported with evidence sufficient to meet the standard required at the various stages of litigation." *Elliott v. City of New York*, No. 06–CV–296 (RPP), 2010 WL 4628508, at *9 (S.D.N.Y. Nov. 15, 2010) (citing *Lujan*, 504 U.S. at 561). Therefore, whereas a plaintiff whose standing is challenged by way of a summary judgment motion must respond with competent evidence sufficient to pass muster under Fed. R. Civ. P. 56, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Am. Bird Conservancy v. Harvey*, No. 16-cv-1582 (ADS)(AKT), 2017 WL 477968, at *7 (E.D.N.Y. Feb. 6, 2017) (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016)). Here, because the Defendant's motion to dismiss is facial, (*i.e.* based solely on the allegations in the complaint), "the plaintiff has no evidentiary burden" and "[t]he task of the district court is to determine whether the

[p]leading 'allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue.'" *Id.* (citing *Carter*, 822 F.3d at 56) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)); *Ali*, 2015 WL 7281633, at * 4. In carrying out this task, the Court presumes that general allegations embrace more specific facts that are necessary to support the claim. *Lujan*, 504 U.S. at 561.

### A. Injury-in-Fact

An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citations and internal quotation marks omitted). To establish standing, a Plaintiff must satisfy the dual requirements of "particularization" and "concreteness." *Id.* at 1548; *Bellino v. JPMorgan Chase Bank, N.A.*, No. 14-CV-3139 (NSR), 2016 WL 5173392, at *2 (S.D.N.Y. Sept. 20, 2016). For an injury to be particularized, "it must affect the plaintiff in a *personal and individual* way." *Spokeo*, 136 S. Ct. at 1548 (emphasis added) (collecting cases). Meanwhile, concreteness refers to the "realness" of the injury—meaning that the injury "must actually exist" and cannot be "abstract." *Id.*

Defendants argue that Gilmore fails to allege an injury-in-fact because she "fails to plead any facts plausibly indicating that she suffered an injury beyond that already addressed by the 2013 Consent Orders." (Def. Mem. at 8). Defendants add that because the CFPB and DOJ have already "determined the compensation due to Plaintiff based on [their] allegations[,]" and Plaintiff does not allege any further injury or that the Compensation offered pursuant to the Agencies calculation is insufficient[,]" she has not adequately plead an injury-in-fact. *Id.*[2] Although the Defendants do not address concreteness and particularity requirements separately, in light of the recent guidance from *Spokeo*, this Court will do so.

#### 1. *Particularity*

Gilmore has failed to plead a sufficiently particularized claim. Though Gilmore does allege certain facts that speak to her personal transaction—visiting Kristal Auto Mall in July 2013, (Compl. ¶ 12), entering a retail installment contract" reflecting her interest rate of 9.54%, (*Id.* ¶13), and receiving a letter notice from the DOJ and CFPB informing her about the $80 Million settlement, (*Id.* ¶14)—nowhere in her Complaint does she allege that she *personally* was treated in a discriminatory manner based on her race or that she *personally* suffered from having to pay an interest rate that was higher than that charged to non-African American customers who entered loan agreements funded by Defendants at the same dealer.

Courts typically require such a personal connection in ECOA cases. *See e.g.*, *Masudi v. Ford Motor Credit Co.*, No. 07-CV-1082 (CBA)(LB), 2008 WL 2944643, at *4 (E.D.N.Y. July 31, 2008) (district court found the plaintiff's ECOA complaint to be inadequately plead because it "d[id] not allege a single event, policy or action taken by either of the defendants regarding *plaintiff's* car loan, nor d[id] plaintiffs allege

---

[2] Defendants point to paragraphs in the two Consent Orders that they claim preclude the court from reviewing the final payment amounts calculated pursuant to the Consent Orders. (*See* Def. Mem. 1, at 9). Defendants further argue that because Plaintiff fails to allege an injury beyond what is addressed in these orders, the Court should construe the Complaint as "a request to review the individual payment amount for Plaintiff pursuant to the Orders" in spite of that being impermissible by the terms of the Orders. (*Id.*).

how the finance charges imposed on *their* loan were discriminatory." (emphasis in original)); *see also Osborne v. Amsouth Bank*, No. 3:02-CV-577, 2003 WL 22025067 (M.D. Tenn. July 15, 2003) (district court dismissed plaintiff's ECOA claims on summary judgment as plaintiff failed to prove that she had suffered an injury-in-fact and evidence showed that she *individually* paid less mark-up than average white customers at the dealership).

Here, the Complaint simply states that Gilmore is part of a class that was identified in a separate investigation as having *possibly* suffered inflated interest rates on car loans financed by Defendants during a particular time period. (*See* Compl. ¶¶ 14, 28–31). But being a member of a group that allegedly suffered from a discriminatory practice based on unproven claims in a separate lawsuit with different parties does not indicate that Gilmore *herself* suffered an injury that was the result of racial discrimination at the time that she entered the loan. *See Masudi*, 2008 WL 2944643, at *5 ("The Court agrees that the settlement in the [prior related] case does not establish that defendants discriminated against [*the instant plaintiffs*]." (emphasis in original)). Although Plaintiff was one of the consumers identified in the underlying action, Plaintiff still cannot rely on the unproven claims of that separate action to plausibly allege that she has a personal stake in this litigation. While a prior related case can "inform" a lawsuit, it "cannot serve as the sole basis for [a party's] claim." *Id.* at *5.

More importantly, where a plaintiff's standing is at issue, the Court is simply not at liberty to make favorable inferences. *Spokeo*, 136 S. Ct. at 1547 ("Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element of standing." (internal quotation marks and citations omitted)); *see also Warth v. Seldin*, 422 U.S. 490, 518, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975) ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."); *Morrison*, 547 F.3d at 170 ("Jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."). Therefore, the Court finds that Gilmore's claim is too generalized to demonstrate a particularized injury.

2. <u>Concreteness</u>

The Complaint alleges that "Plaintiff, and each Class Member, has been damaged to the extent of a specific amount based upon a discriminatorily inflated interest rate over the fixed terms of the loans." (Compl. ¶ 2). Typically, this would suffice as a concrete injury because "[a]ny monetary loss suffered by the plaintiff satisfies the element; including 'even a small financial loss.'" *Carter*, 822 F.3d at 55–56 (2d Cir. 2016) (quoting *Natural Resources Defense Council, Inc. v. United States Food & Drug Administration*, 710 F.3d 71, 85 (2d Cir 2013)). However, Gilmore was already identified by the DOJ as one of the individuals who was subject to inflated interest rates; and consequently, she was already offered monetary relief to redress any past damages she suffered. (*See* Compl. ¶ 14; DOJ Consent Order; CFPB Consent Order).

Nowhere does Plaintiff state that the relief she was offered failed to compensate her for the past harm she suffered. Although Plaintiff may have *chosen* not to accept the payment offered, because the damages caused by the alleged "discriminatorily inflated interest rate" are the *only* damages pleaded, absent any allegations that the presented redress was insufficient or that

7

Plaintiff suffered additional harms, there is no concrete past harm for this Court to redress.

For the same reason, Plaintiff's request for injunctive relief is unfounded. Injunctive relief is only appropriate if there is an ongoing harm. "If respondent had alleged a continuing violation or the imminence of a future violation, the injunctive relief requested would remedy that alleged harm." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998); *Vaughn v. Consumer Home Mortg. Co.*, 297 F. App'x 23, 25 (2d Cir. 2008) ("Although past injuries may confer standing to seek money damages, they do not confer standing to seek equitable relief unless the plaintiff can demonstrate that he or she is likely to be harmed again in the future and in a similar way."); *Trowbridge v. Cuomo*, No. 16 Civ. 3455 (GBD), 2016 WL 7489098, at *7 (S.D.N.Y. Dec. 21, 2016) (same); *Floyd v. City of N.Y.*, 283 F.R.D. 153, 169 (S.D.N.Y. 2012) (same); *see e.g.*, *Smith v. Chrysler Fin. Co.*, No. Civ.A.00-CV-6003 DMC, 2004 WL 3201002, at *4 (D.N.J. Dec. 30, 2004) (similar ECOA case where court found that plaintiff did not have standing for injunctive relief because allegation that Plaintiff *may be* discriminated against again in the future was "simply too speculative… in light of the fact that Defendant may not ever be involved in the financing of Plaintiff's hypothetical future Chrysler purchases.").

Plaintiff has not pleaded that Defendants are presently violating any laws or that she continues to suffer from their conduct. The DOJ Consent Order requires strict compliance with the ECOA and contains a detailed section outlining the injunctive relief that the Defendants must provide. (*See* DOJ Consent Order, at 5–11). Among the enumerated requirements, this section: (1) enjoins Defendants from engaging in any act or practice that discriminates on the basis of race or national origin with respect to the pricing of automobile loans in violation of the ECOA; (2) mandates that Defendants create a compliance committee to monitor Defendants' adherence to provisions in the Consent Order and regularly submit written reports to the CFPB and DOJ; (3) requires Defendants to implement a compliance plan that will limit dealers' maximum rate spread, provide regular notices to all dealers explaining the ECOA provisions, provide quarterly analysis of dealer-specific retail installment contract pricing data for disparities on any prohibited bases, and provide appropriate corrective action with respect to dealers who are identified in for disparities on a prohibited basis; (4) provide annual remuneration to each of the African-American, Hispanic, and Asian/Pacific Islanders that were affected consumers by the CFPB and DOJ during the relevant preceding period; and (5) submit any non-discretionary Dealer Compensation plans to the CFPB and DOJ for prior approval (*Id.* at 6–8).

Plaintiff never alleges that she is still making payments at an inflated interest rate without having been offered adequate compensation or a rate adjustment. Plaintiff also never alleges that Defendants failed to provide *any* of the compensatory, punitive, or injunctive relief required by the DOJ Consent Order. Thus, Plaintiff has failed to plead a concrete injury that is ongoing or imminent for which injunctive is necessary. *See Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) ("Where, as here, a plaintiff seeks prospective injunctive relief, he must also demonstrate 'that he is realistically threatened by a repetition of [the violation]") (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 109, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("enhanced risk of future injury may [sometimes] constitute injury-in-fact, [but] . .

. such injuries are only cognizable where the plaintiff alleges actual future exposure to that increased risk") (internal quotation marks omitted).

In addition, Plaintiff cannot assert standing by claiming to be part of a putative class that would, if certified, have an injury because the standing of an individual named plaintiff must be ascertained first. *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ("[N]o class may be certified that contains members lacking Article III standing."); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289, 334 (S.D.N.Y. 2003) (noting that "each member of the class must have standing with respect to injuries suffered as a result of defendants' actions"); 7 AA Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, FED. PRAC. & PROC. CIV.3d § 1785.1 (2005) ("[T]o avoid a dismissal based on a lack of standing, the court must be able to find that both the class and the representatives have suffered some injury requiring court intervention."); Herbert B. Newberg & Alba Conte, 1 NEWBERG ON CLASS ACTIONS § 2.7 (4th ed. 2002) ("…the standing issue focuses on whether the plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court.").

Plaintiff's conclusory allegations fall short of the standard to demonstrate standing. *Carter*, 822 F.3d at 56 ("The task of the district court is to determine whether the [p]leading alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." (internal marks and alterations omitted)). Accordingly, the Court finds that Plaintiff has inadequately pleaded a past, present, or future injury-in-fact.

Although, this finding is enough for the Court to conclude that Plaintiff lacks Article III standing, because the Defendants have raised issues of traceability and redressability in their motion to dismiss, the Court will briefly address each.

### B. Fairly Traceable

The second element of standing requires "a causal connection between the injury and the conduct complained of. *Lujan*, 504 U.S. at 560. This means that the harm alleged must be "fairly… trace[able] to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org*, 426 U.S. 26, 41–42, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976).

The traceability requirement requires a plaintiff to "demonstrate a causal nexus between the defendant's conduct and the injury." *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (citing *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992). While "such a nexus is most easily shown if there is a direct relationship between the plaintiff and the defendant … to establish that, in fact, the asserted injury was the consequence of the defendants actions, indirectness is not necessarily fatal to standing … because the fairly traceable standard is lower than that of proximate cause." *Id.* (internal citations and quotation marks omitted). *See Carter*, 822 F.3d at 55–56 ("A defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III standing."); *Fero v. Excellus Health Plain, Inc.*, No. 6:15-CV-06569 (EAW), 2017 WL 713660, at *14 (W.D.N.Y. Feb. 22, 2017) (finding that because the standard for causation is "not an onerous hurdle," plaintiffs' claim was sufficient where it implicated the defendants through "chains of events" even though it did not rule out alternative sources of their injuries.).

Defendants argue that Plaintiff has not demonstrated that it is "likely [that her] injury was caused by the challenged conduct of the defendant, and not by the independent actions of third parties not before the court." (Def. Mem. at 9) (citing *Lujan*, 504 U.S. at 560). Defendant adds that Plaintiff's allegations "cannot establish a direct relationship between Ally's alleged conduct and her alleged injury." (*Id.*).

The Court declines to adopt Defendants' high bar for traceability. As discussed above, although causation is *most easily* shown if there is a direct relationship, "indirectness is not fatal to standing." *Rothstein*, 708 F.3d at 91. Plaintiff alleges that "[i]t is Ally's specific policy and practice to permit dealers to mark up the buy rate for reasons not related to the borrower's creditworthiness or other objective criteria related to borrower risk[,]" and that as a result "Ally's policy and practice creates financial incentives for dealers to mark up borrowers' interest rates above those established based on consumer's creditworthiness or other objective criteria related to borrower risk[,]" which results in African-American borrowers paying higher interest rates for their loans than white borrowers. (Compl. ¶¶ 16–17).

Such allegations are sufficiently plausible to pass the less-than-onerous standard for causation required at this stage of the action. Moreover, other district courts have found such schemes sufficient to satisfy the standard. *See e.g., Miller v. Countrywide Bank*, *N.A.*, 571 F. Supp. 2d 251, 259 (D. Mass. 2008) (finding that complaint where plaintiff cited reports reflecting that defendants' granting "markup discretion" to brokers, employees, and other mortgage companies often lead to discriminatory results sufficiently gave "rise to a fair inference of causation"); *cf. Masudi*, 2008 WL 2944643, at *4 (finding that where plaintiffs Complaint contained no facts or statistics to show how defendants discriminated against them, "vague generalities" were insufficient to show causation between defendants conduct and discriminatory practices).

### C. Redressable

Redressability "requires a court to determine whether it possesses the ability to remedy the harm that a petitioner asserts." *Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, 345 F. Supp. 2d 1151, 1165 (W.D. Wash. 2004) (citing *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 975–76 (9th Cir. 2003)). In this regard, … "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976)).

In the instant case, the absence of any concrete harm prevents there from being any remedies that the Court can grant. As already explained, Plaintiff has not alleged that she has suffered monetary damages that were insufficiently redressed in the 2013 DOJ Consent Order.[3] (Section A.2., *supra*). Nor has Plaintiff alleged that there is any imminent, ongoing injury for the Court to equitably relieve. (*Id.*). In similar vein, Plaintiff's request for attorney's fees and the costs of litigation, (Compl. ¶ 48),

---

[3] In her memorandum, Plaintiff argues that the money she was offered in the settlement order cannot be considered a "set off in a Related Consumer Action." (Pl. Mem. at 6). However, she repeatedly cites language from the CFPB Consent Order that pertains to the *separate civil money penalty* that the Defendants paid to the government in the sum of $18 million and not the provisions pertaining to the $80 million settlement fund that was set as redress for the affected consumers.

detrimentally lack connection to a concrete injury. "[A] plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself." *Steel Co.*, 523 U.S. at 107 (citations omitted). "An 'interest in attorney's fees is ... insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim.'" *Id.*

As Plaintiff's Complaint seeks all "relief as may be appropriate" under the ECOA § 1691e(h) (Compl. ¶ 38), Plaintiff implicitly seeks the declaratory and punitive damages available under the statute. But like equitable and compensatory relief, declaratory relief and punitive damages necessitate a showing of concrete injury. *Steel Co.*, 523 U.S. at 107 ("although a suitor may derive great comfort and joy from the fact that the United States Treasury is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury" (citing *Allen*, 468 U.S. at 754–755; *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 482–483, 102 S. Ct. 752, 764, 70 L. Ed. 2d 700 (1982)). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Id.*

Accordingly, the Court finds that Plaintiff fails to allege any redressable injuries.

**CONCLUSION**

For all the foregoing reasons, the Court finds that Plaintiff has failed to adequately plead that she has Article III standing to bring this suit. Defendants' Motion to Dismiss is therefore **GRANTED** with leave to amend.

SO ORDERED.

*Ramon E. Reyes, Jr.*
RAMON E. REYES, JR.
United States Magistrate Judge


Dated: April 24, 2017
       Brooklyn, NY